# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| WALTER R. JENKINS, JR., | : | |
| 662 Pinewood Ave. | : | |
| Toledo, OH 43604, | : | CIVIL ACTION NO. |
| | : | |
| Plaintiff, | : | |
| | : | JUDGE |
| v. | : | |
| | : | MAGISTRATE JUDGE |
| PROMEDICA HEALTH SYSTEM, INC., | : | |
| *dba* PROMEDICA FLOWER HOSPITAL, | : | |
| c/o CT CORPORATION SYSTEM, | : | |
| Statutory Agent, | : | |
| 4400 Easton Commons Way, Ste. 125 | : | |
| Columbus, OH 43219, | : | **JURY DEMAND ENDORSED HEREON** |
| | : | |
| Defendant. | : | |

## COMPLAINT

### I.  Preliminary Statement

1. This action seeks economic, compensatory, and punitive damages; declaratory, injunctive and equitable relief; prejudgment and post-judgment interest; and attorneys' fees and costs for the violations of the Reconstruction Civil Rights Act, 42 U.S.C. §1981; Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.*; and the Ohio Laws Against Discrimination, R.C. Ch. 4112, committed in Defendant's (1) denying, because of his minority race, Plaintiff a promotion on May 16, 2018 to Weekend Lead despite his being qualified for the position while instead promoting a non-minority Caucasian worker with lower qualifications; (2) denying, because of his minority race and in retaliation for his good-faith complaints about racism and harassment, including administrative charges, on January 5, 2019 promotion to Weekend Lead and again on September 30, 2019 to Environmental Services Team Lead despite his being

1

qualified for the positions while promoting non-minority Caucasian workers, who did not make any such complaints or charges, with the same or lower qualifications; (3) subjecting him to and failing to address or end ongoing pervasive harassment by his co-workers and supervisor in the form of racially-based name-calling, the persistent singing of a hip-hop song derivative of that name-calling, differential treatment, and isolation because of his race and in retaliation for his good-faith complaints about racism, inflicting a hostile work environment; and (4) placing him on unpaid administrative leave for three days for a concocted violation of policy and changing its per diem policy and applying the new policy only to Mr. Jenkins, and not his similarly situated non-minority co-workers, as pretext for his race and in retaliation for his administrative charges to the Ohio Civil Rights Commission and the Equal Employment Opportunity Commission.

## II. Jurisdiction and Venue

2. Plaintiff brings race discrimination, racial harassment, and retaliation claims under the Reconstruction Civil Rights Act, 42 U.S.C. §1981; Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq*.; and the Ohio Laws Against Discrimination, R.C. 4112.99.

3. This Court has jurisdiction by virtue of 28 U.S.C. §§ 1331 (federal question); 1343 (civil rights); and 1367 (supplemental jurisdiction).

4. Based on a timely-filed charge affidavit, Plaintiff received a Right-to-Sue Letter from the Equal Employment Opportunity Commission on March 4, 2021, less than 90 days ago.

5. Declaratory, injunctive, and equitable relief, including reinstatement, are sought pursuant to 28 U.S.C. §§ 2201; 2202, and the common law of the State of Ohio.

6. Compensatory and punitive damages may be awarded under §1981; Title VII; R.C. 4112.99; and the common law of the State of Ohio.

7. Costs and attorneys' fees may be awarded pursuant to the 42 U.S.C. § 1988; Title VII, 42 U.S.C. § 2000e-5(k); Fed. R. Civ. P. 54; and the common law of the State of Ohio.

8. Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) and N.D. Civ. R. 82.1 because the claims arose in and around Lucas County, Ohio, where Defendant ProMedica Health System, Inc. locates its headquarters, conducts its operations, and employs and failed to promote Plaintiff.

### III. Parties

9. Plaintiff Walter R. Jenkins, Jr. ("Mr. Jenkins") is an African-American resident of Lucas County, Ohio; has been employed by Defendant ProMedica Health System, Inc. ("Defendant ProMedica") in a W-2 position as an Environmental Services Specialist I on a per diem basis for approximately four years; earns approximately $14.93 per hour and works at least 24 hours per month.

10. Defendant ProMedica is an Ohio corporation incorporated in the State of Ohio; maintains its principal place of business in and around Toledo, Ohio located in Lucas County; employs, on a daily basis each week, more than 20 employees; operates a health system serving communities in 28 states, including 13 hospitals, four ambulatory surgery centers, and more than 400 post-acute facilities, with nearly 56,000 employees; and, at all times material to this Complaint, employed Plaintiff as an Environmental Services Specialist I and subjected him to a hostile work environment and failed to promote him on several occasions because of his race and/or in retaliation for his good-faith complaints of racial discrimination.

### IV. Facts

11. Mr. Jenkins began working for Defendant ProMedica on January 15, 2017 as an Environmental Services Specialist I.

12. He began as a per diem employee, even though he worked forty hours each week, and was not entitled to benefits.

13. Mr. Jenkins attended college while initially working full-time hours for Defendant ProMedica.

14. In April 2018, Mr. Jenkins was recommended by one of his supervisors, Ray Kasparian ("Supervisor Kasparian"), to Defendant ProMedica's Manager of Campus Environmental Services Department, Paul Beauch ("Manager Beauch"), to take over the second shift Weekend Lead position, as the current Lead was having problems and would need to be replaced soon.

15. Mr. Jenkins then met with Manager Beauch about the promotion and was told that he was "qualified for the position" and that it would be a great resume booster for him to have supervisor experience.

16. Mr. Jenkins said he was willing to become a lead and was sent to Defendant's training facilities for lead training on April 16, 2018, which he completed.

17. On May 16, 2018, Mr. Jenkins was denied a promotion to Weekend Lead, which offered a $3.00 per hour pay raise, benefits, and additional hours each week, when Defendant ProMedica awarded the position to a lesser qualified Caucasian individual, Alyssa Twardos ("Ms. Twardos").

18. While Mr. Jenkins was up to date on his Lead training and had prior Lead experience, Ms. Twardos had no such prior experience, did not have a GED, had a poor performance record, and was not fully trained when awarded the Weekend Lead position.

19. Because Mr. Jenkins was not awarded the Weekend Lead position, he promptly sought and secured a second job on May 30, 2018, which caused him to shift his schedule to

twenty-four hours per month with Defendant ProMedica to make up for the lost income he expected to receive from the Weekend Lead position.

20. Because of his second job, Mr. Jenkins had limited availability and it was agreed he would work every other weekend for Defendant.

21. On August 25, 2018, Mr. Jenkins was training his Caucasian co-worker, Jake Zeiler ("Mr. Zeiler").

22. Upon arriving that day, Mr. Jenkins' supervisor, Jim Bates, a Lead for Defendant ProMedica ("Lead Bates"), made a comment to Mr. Jenkins that he should "lay off the crack pipe"; this comment was made in front of Mr. Zeiler.

23. Mr. Jenkins brought up something about how Mr. Zeiler had to use a "black key" for a task, and he responded, "you are the black key."

24. Later that day, Mr. Zeiler told Mr. Jenkins to get his trash and called him a "bitch."

25. Mr. Jenkins replied that he should not use that term to describe him.

26. Mr. Zeiler further told Mr. Jenkins that he had a "kill list" at his last job and seemed to follow Mr. Jenkins in his Camaro after work.

27. Mr. Jenkins reported Mr. Zeiler's behavior to Lead Bates.

28. Lead Bates responded by laughing about Mr. Zeiler's behavior.

29. Upon learning of the nickname, "black key," Lead Bates started singing a Drake song, "KiKi Do You Love Me?," to Mr. Jenkins.

30. Mr. Jenkins found this song offensive because Lead Bates was using "KiKi" to reference the racially-charged nickname given to him by Mr. Zeller, "black key," and told Lead Bates that he found the song offensive.

31.     Lead Bates simply responded that Mr. Jenkins' new name would be "K.B." which was code for "key bitch."

32.     The nicknames "K.B." and "key bitch" were derived from the first iteration of Mr. Jenkins' nickname, "black key," ostensibly made in jest towards his race and were intended to continue making fun of Mr. Jenkins because of his race.

33.     Rather than put an end to the racially-charged nickname and other concerning behaviors by Mr. Zeiler, Lead Bates continued the name-calling and joined in on it, despite knowing its racial underpinnings and that Mr. Jenkins took offense to the names and singing.

34.     The same day that Lead Bates' joined in on the harassment, on August 25, 2018, Mr. Jenkins complained of his and Mr. Zeiler's behavior to Manager Beauch.

35.     After reporting Lead Bates to Manager Beauch, Mr. Jenkins was working that same day with Mr. Zeiler when Lead Bates came up to Mr. Jenkins and sang, "K.B. do you love me?"

36.     Mr. Jenkins' co-worker, Greg Jones ("Mr. Jones"), also an African-American employee, overheard the name-calling and singing and confronted Lead Bates about the harassment on Mr. Jenkins' behalf, but the conduct endured.

37.     Following Lead Bates' behavior, other co-workers, including Mr. Zeiler, Larry Hunt ("Mr. Hunt"), and Erica Hunt ("Ms. Hunt"), started harassing Mr. Jenkins by singing the Drake song with the nickname "K.B."

38.     Mr. Jenkins then escalated his concerns to Senior Human Resources Generalist Randy Lucas ("Sr. HR Generalist Lucas"), but was told he had to talk to Manager Beauch about everything.

39. After Mr. Jenkins complained to Manager Beauch and Sr. HR Generalist Lucas, Lead Bates began publicly humiliating Mr. Jenkins by criticizing his work and threatening to give away his job duties.

40. On September 4, 2018, Lead Bates called Mr. Jenkins at home about "keys" and said, "I got your number now, I can keep calling you."

41. On September 7, 2018, Mr. Jenkins again reported Lead Bates' comments and singing to Manager Beauch via email.

42. On or around September 8, 2018, Lead Bates also struck Mr. Jenkins with a roll of plastic bags on his arm, and later made a reference to Mr. Jenkins' continuing to "screw him over" as reason for denying Mr. Jenkins a ten-minute break.

43. Later that day, Mr. Jenkins learned from his co-worker, Liz LNU, that Lead Bates wanted her to learn the trash job, which was Mr. Jenkins' assignment.

44. On September 9, 2019, Lead Bates told Mr. Jenkins, in front of his co-workers, to clock out because he did not want to see his "ugly face."

45. Again, Mr. Jenkins reported Lead Bates to Manager Beauch for his harassing conduct.

46. The name-calling and the singing by Lead Bates and other co-workers continued to occur on almost every shift Mr. Jenkins worked.

47. Manager Beauch failed to remedy the harassment Mr. Jenkins was experiencing and it continued, only increasing in frequency.

48. On September 11, 2018, Mr. Jenkins dual-filed a Charge with the Ohio Civil Rights Commission ("OCRC") and the Equal Employment Opportunity Commission ("EEOC"), alleging he was experiencing a hostile work environment based on race, detailing the name

7

calling, singing, humiliation, and racial discrimination when he was not promoted to Weekend Lead over Ms. Twardos.

49. After filing his Charge, Mr. Jenkins noticed that the humiliation, nicknames, and singing by Lead Bates increased in frequency.

50. On September 14, 2019, Mr. Jenkins met with Manager Beauch and Sr. HR Generalist Lucas after sending several more emails reporting the harassment he was experiencing.

51. During this meeting, Manager Beauch said that Lead Bates "assumed that it was okay to joke" with Mr. Jenkins.

52. Sr. HR Generalist Lucas explained that he had not met Lead Bates before and thought maybe the conduct came from his "sense of humor."

53. Manager Beauch then told Mr. Jenkins that Lead Bates was someone he trusted and who performed well for him.

54. Mr. Jenkins explained that he no longer wanted to work with Lead Bates or near him, only to be told that switching shifts was not going to be an option just because he felt uncomfortable.

55. Manager Beauch and Sr. HR Generalist Lucas explained that mediation with Lead Bates and Mr. Jenkins was the next step.

56. Sr. HR Generalist Lucas also told Mr. Jenkins that it was Mr. Jenkins' responsibility to tell Lead Bates that he did not like what he is doing.

57. On September 17, 2018, Mr. Jenkins again submitted a complaint about Lead Bates' harassing behavior via email to Manager Beauch.

8

58. On September 20, 2018, Mr. Jenkins was called to mediation with Sr. HR Generalist Lucas, Manager Beauch, and Lead Bates.

59. Upon entering the mediation, the other parties were already present and Sr. HR Generalist Lucas asked various questions.

60. Manager Beauch stated that Lead Bates "confessed to saying everything [excluding the comment about screwing him over] but he was only joking."

61. Mr. Jenkins explained that he felt that certain actions could not be taken back and that he did not feel comfortable working with Lead Bates and reiterated his request to switch shifts.

62. Sr. HR Generalist Lucas responded, "We are not going to bring up past conversations" and, "You feeling uncomfortable is not a reason for you to switch shifts nor for us to term someone."

63. Sr. HR Generalist Lucas expressed that he believed Mr. Jenkins was merely "holding a grudge."

64. Mr. Jenkins denied doing so and was met with, "Well that's exactly what it sounds like."

65. Manager Beauch again reiterated that he trusted Lead Bates.

66. Lead Bates then spoke to Mr. Jenkins, stating, "If I ever offend you, just call me a schmuck."

67. Sr. HR Generalist Lucas concluded the mediation by suggesting that Mr. Jenkins and Lead Bates "have a cup of coffee for five minutes and talk together."

68. The mediation lasted only fifteen minutes.

69. After this mediation, Lead Bates and other co-workers continued calling Mr. Jenkins names and singing "K.B. do you love me" to him.

70. Two days after the mediation, Lead Bates conveyed to the team that anyone who wanted to speak with Manager Beauch needed to speak with a lead or a supervisor first.

71. When questioned as to why a new policy for speaking with Manager Beauch was implemented, Lead Bates replied that "there had been complaints about people waiting to speak with Paul."

72. On December 15, 2018, Lead Bates put Mr. Jenkins on unpaid administrative leave for three days and was told it was because of a perceived violation of Defendant ProMedica's flu vaccination deadline.

73. Defendant ProMedica maintained a vaccination policy for the flu which set a deadline by which employees either had to show proof of receiving the vaccine or start wearing a mask if the vaccine was declined or proof was not shown.

74. In fact, the deadline for the proof of vaccination was January 14, 2019, which had not even passed when Mr. Jenkins was placed on administrative leave on December 15, 2018.

75. No employees had ever been placed on administrative leave for failing to show the requisite proof of vaccination until Mr. Jenkins was unable to produce such proof due to attending his grandmother's funeral.

76. Instead, Mr. Jenkins was put on unpaid administrative leave because of his race and in retaliation for filing his administrative Charge.

77. On January 10, 2019, Mr. Jenkins dual-filed a second Charge with the OCRC and EEOC regarding the continued harassment by Lead Bates and discrimination and retaliation for the administrative leave.

78. Three days after filing his second Charge, on January 13, 2019, Mr. Jenkins was issued a written disciplinary action by Manager Beauch for tasks not completed in July 2018.

79. Just prior to his second Charge, on January 7, 2019, Mr. Jenkins learned that he was not going to be promoted to Weekend Lead after the position opened due to Ms. Twardos' termination.

80. Mr. Jenkins thereafter learned that the position was awarded to a Caucasian co-worker, Francis "Skip" Heckman ("Mr. Heckman"), who had previously been removed from the Weekend Lead position due to significant performance concerns.

81. Mr. Jenkins was, according to Supervisor Kasparian, on track to receive the next promotion to Weekend Lead, but he was not even considered for the position upon Ms. Twardos' termination.

82. Mr. Jenkins was also denied the opportunity to be the Backup Lead to Mr. Heckman on this same occasion; upon information and belief, the Backup Lead position was awarded to a less qualified and less experienced non-minority individual who had not engaged in any protected activity.

83. During this time, the name-calling and harassment continued, including an incident where Mr. Hunt called Mr. Jenkins "skinny" and told him to "eat a sandwich."

84. On January 20, 2019, Mr. Jenkins requested to meet with management to report escalating harassment.

85. On January 28, 2019, Mr. Jenkins met with Vice President and Chief Diversity, Equity, and Inclusion Officer Greg Braylock ("VP Braylock") and Manager Beauch to report the ongoing harassment by Lead Bates and other co-workers, stating he believed the humiliation, name-calling, and singing were because of his race and reports of discrimination and harassment.

11

86. On February 27, 2019, Manager Beauch issued a new policy dictating the way shifts would be given to per diem employees.

87. The new policy stated that per diem employees who did not work at least forty hours per pay period would be awarded shifts on a first come, first served basis.

88. Mr. Jenkins did not work forty hours per pay period and had limited availability to work shifts because of a second job he maintained which Defendant ProMedica knew about.

89. Mr. Jenkins was subjected to the new per diem policy and, as such, was losing shifts, putting him at risk of not meeting the required twenty-four hours per month needed to maintain per diem employment.

90. However, two Caucasian employees, Betty Grodi ("Ms. Grodi") and Savanna Wilson ("Ms. Wilson"), were excepted from the policy even though, like Mr. Jenkins, they were both per diem employees who worked less than forty hours per pay period as Environmental Services Specialists.

91. Manager Beauch concocted this policy as a way to "get rid of" Mr. Jenkins for "causing problems" in reference to his two prior administrative Charges, a motivation he admitted to Supervisor Kasparian.

92. Mr. Jenkins also experienced being taken off the schedule altogether by Defendant ProMedica's EVS Support Coordinator, Trina Kern ("Ms. Kern").

93. Ms. Kern told Mr. Jenkins' co-worker, Mr. Jones, that she was taking Mr. Jenkins off the schedule completely to "see if he would quit."

94. Ms. Kern further confirmed to the OCRC in an interview that she did not want to work with Mr. Jenkins because she did not want to be named in OCRC complaints filed by Mr. Jenkins.

95. On March 21, 2019, Mr. Jenkins dual-filed a third Charge with the EEOC and OCRC alleging further harassment, retaliation, and discrimination as the humiliation, name-calling, and singing continued and the discriminatory denial of the promotion to Weekend Lead awarded to Mr. Heckman.

96. The third Charge also alleged race discrimination and retaliation when Defendant ProMedica changed its per diem policy in order to force Mr. Jenkins out of his position.

97. On August 29, 2019, the OCRC found probable cause that Defendant engaged in racial discrimination and harassment in denying Mr. Jenkins the Weekend Lead position on May 16, 2018 and by virtue of his supervisor's and co-workers' pervasive discriminatory humiliation, name-calling, and singing.

98. The same day, Mr. Jenkins met with Manager Beauch and Katherine McAuley from Human Resources ("HR") about his continued complaints, but the harassment endured and no remedial action was taken.

99. During this meeting, Manager Beauch told Mr. Jenkins that he was "apprehensive" around him, ostensibly because he did not want to be named in another administrative charge.

100. Following the third Charge, in August of 2019, Ms. Kern told HR that she did not want to work with Mr. Jenkins because of his administrative charges and the fact that she was already named in one upon being asked to observe and train Mr. Jenkins for an Environmental Services Team Lead Position for which he had applied and was being considered.

101. Ultimately, Ms. Kern was required to observe and train Mr. Jenkins while he was being considered for the Team Lead position, but upon his arrival to the training, she said she did not want to train him.

102. Ms. Kern, who provided the other candidates full eight hour training shifts, cut Mr. Jenkins' training session short and did not fully observe and train him due to her animus towards his complaints of racial discrimination, harassment, and retaliation.

103. Mr. Jenkins was not selected for the Team Lead position.

104. Instead, on September 30, 2019, Defendant ProMedica filled the Team Lead position with a less qualified and less experienced Caucasian candidate, Pamela Rohrbacher ("Ms. Rohrbacher").

105. Ms. Rohrbacher had no prior Environmental Services or housekeeping experience and was working in Defendant ProMedica's Transport division prior to being awarded the Team Lead position.

106. Ms. Rohrbacher also did not have the necessary training for the Team Lead position and was sent for the training during her six-month tenure as Team Lead, requiring her to miss work.

107. Mr. Jenkins already had the requisite Team Lead training, which he received prior to being denied the first Weekend Lead position in May 2018, and experience which Ms. Rohrbacher lacked.

108. On October 24, 2019, the OCRC found probable cause that Defendant engaged in racial discrimination, harassment, and retaliation in placing Mr. Jenkins on unpaid administrative leave and in allowing the racially-based humiliation, name-calling, and singing to endure.

109. On November 21, 2019, the OCRC found probable cause that Defendant engaged in racial discrimination, harassment, and retaliation in failing to promote Mr. Jenkins to Weekend Lead on January 7, 2019 and in changing its policy for per diem employees as to scheduling hours and only subjecting Mr. Jenkins to that policy to force him to quit.

110. On December 11, 2019, Defendant disciplined Mr. Jenkins with Formal Coaching for not calling or showing up for a shift on July 6, 2019, mere weeks after the OCRC found probable cause on his second Charge.

111. Mr. Jenkins was the only employee to ever receive discipline over five months past the date of the alleged policy violation.

112. On December 30, 2019, Mr. Jenkins dual-filed a fourth Charge with the OCRC and EEOC based upon the denial of the Weekend Lead position awarded to Ms. Rohrbacher by Manager Beauch.

113. In his fourth Charge, Mr. Jenkins also alleged continued discrimination, harassment, and retaliation when he was disciplined for the July 6, 2018 allegation on December 11, 2019, and because of Manager Beauch's and Ms. Kern's comments about not wanting to work with him and attempts to get him to quit due to his administrative Charges.

114. Following the fourth Charge, Mr. Jenkins continued to face harassment issues from Lead Bates and other co-workers, which he complained about internally on several occasions.

115. Defendant ProMedica's failure to promote Mr. Jenkins, disciplining him, and placing him on unpaid leave for three days was because of his race and in retaliation for his internal complaints and administrative charges about perceived racial discrimination and harassment.

116. In investigating Mr. Jenkins' four Charges, the OCRC found probable cause for racial discrimination, harassment, and retaliation on several of his allegations.

117. On October 22, 2020, the OCRC found probable cause that Defendant engaged in racial discrimination, harassment, and retaliation in failing to promote Mr. Jenkins to EVS Team Lead on September 30, 2019 and for disciplining him on December 11, 2019.

118. As a direct and proximate result of Defendant's failure to promote Mr. Jenkins, its subjecting him to a hostile work environment, and placing him on unpaid administrative leave because of his race and/or in retaliation for his protected activity in complaining about racial discrimination and harassment, Mr. Jenkins suffered and continues to suffer economic loss in the form of lost income, despite reasonable but unsuccessful efforts to secure comparable employment.

119. As a direct and proximate result of Defendant's failure to promote Mr. Jenkins, its subjecting him to a hostile work environment, and placing him on unpaid administrative leave because of his race and/or in retaliation for his protected activity in complaining about racial discrimination and harassment, Mr. Jenkins suffered and continues to suffer from emotional distress, frustration, and humiliation.

120. As a direct and proximate result of Defendant's failure to promote Mr. Jenkins, its subjecting him to a hostile work environment, and placing him on unpaid administrative leave based on racial discrimination and/or in retaliation for his protected activity in complaining about racial discrimination and harassment, Defendant acted with conscious disregard toward his right to remain free from discrimination and retaliation, even though their conduct had a great probability of causing him economic and emotional hardship, and did cause such harm.

121. To date, Mr. Jenkins still suffers from ongoing pervasive harassment at work, despite numerous complaints to HR and Manager Beauch about the differential treatment and harassment done because of his race and in retaliation for his protected activity.

16

**V.** **Claims**

    **A.** **Count I: Violation of Reconstruction Era Civil Rights Act**

122. Paragraphs 1 through 121 are incorporated herein as if fully set forth.

123. By failing to promote Plaintiff on May 16, 2018, January 5, 2019, and September 30, 2019 because of his race and/or in retaliation for his protected opposition to racism he sincerely and reasonably perceived to be discriminatory, Defendant violated his rights under 42 U.S.C. § 1981.

    **B.** **Count II: Violation of Title VII of Civil Rights Act of 1964**

124. Paragraphs 1 through 120 are incorporated herein as if fully set forth.

125. By denying Plaintiff an equal opportunity at a promotion on May 16, 2018, January 5, 2019, and September 30, 2019 because of his race and/or in retaliation for making complaints he sincerely and reasonably perceived about racial disparities, as well as subjecting him to and failing to remedy a hostile work environment based on his race and by placing him on unpaid administrative leave for three days based on a pretextual policy violation, Defendant violated Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*.

    **C.** **Count III: Violation of Ohio Laws Against Discrimination**

125. Paragraphs 1 through 120 are incorporated herein as if fully set forth.

126. By failing to promote Plaintiff on May 16, 2018, January 5, 2019, and September 30, 2019 because of his race and/or in retaliation for making complaints he sincerely and reasonably perceived about racial disparities, as well as subjecting him to and failing to remedy a hostile work environment based on his race and by placing him on unpaid administrative leave for three days based on a pretextual policy violation, Defendant violated the Ohio Laws Against Discrimination, R.C. 4112.99.

## VI. **Prayer for Relief**

WHEREFORE, Plaintiff is entitled to and prays for the following relief:

A. a declaration that Defendant violated 42 U.S.C. § 1981; Title VII of the Civil Rights Act; and/or the Ohio Laws Against Discrimination;

B. equitable relief of promoting Mr. Jenkins to a Lead position;

C. wages, salary, employment benefits, and other compensation denied or lost to him, exceeding $75,000, because of Defendant's violations;

D. compensatory and punitive damages in an amount exceeding $25,000;

E. prejudgment and postjudgment interest:

F. costs and attorneys' fees; and

G. such other relief as the Court deems fair and equitable.

Respectfully submitted,

By: /s/ *Madeline J. Rettig*
Madeline J. Rettig (0098816)
(*mrettig@marshallforman.com*)
John S. Marshall (0015160)
(*jmarshall@marshallforman.com*)
Edward R. Forman (0076651)
(*eforman@marshallforman.com*)
Samuel M. Schlein (0092194)
(*sschlein@marshallforman.com)*
Helen M. Robinson (0097070)
(*hrobinson@marshallforman.com*)
MARSHALL & FORMAN LLC
250 Civic Center Dr., Suite 480
Columbus, Ohio 43215-5296
(614) 463-9790
Fax (614) 463-9780

**OF COUNSEL:**
Louis A. Jacobs (002101)
(*LAJOhio@aol.com*)
177 19th St., Apt. 9C
Oakland, CA 94612
(614) 203-1255
Fax (614) 463-9780

## JURY DEMAND

Plaintiff demands a trial by jury on all issues and defenses triable to a jury.

By: /s/ *Madeline J. Rettig*
Madeline J. Rettig (0098816)